**Affirmed and Memorandum Opinion filed May 3, 2022.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-21-00687-CV

---

## IN THE INTEREST OF A.B.M., A CHILD

---

**On Appeal from the 313th District Court
Harris County, Texas
Trial Court Cause No. 2020-00949J-A**

---

## M E M O R A N D U M   O P I N I O N

Appellant S.E.M. ("Father") appeals the trial court's final decree terminating his parental rights to his child A.B.M. ("Andy")[1] and appointing Andy's maternal grandmother as the child's sole managing conservator. The trial court terminated Father's parental rights on predicate grounds of endangering conduct, constructive abandonment, and failure to comply with his family service plan. The court also found that termination was in the child's best interest. On appeal, Father challenges

---

[1] "Andy" is a pseudonym. Pursuant to Texas Rule of Appellate Procedure 9.8, we use fictitious names to identify the minor and other individuals involved in this case.

the legal and factual sufficiency of the evidence to support the predicate grounds, the best interest finding, and the appointment of the grandmother as Andy's managing conservator. Because we conclude that legally and factually sufficient evidence supports the trial court's endangering conduct and best interest findings, as well as the appointment of the grandmother as Andy's managing conservator, we affirm the judgment.

## Background

Andy was born in 2010 in Utah. Andy's mother ("Mother") and Father lived in Utah but were not married. In 2012, Father's paternity was established through DNA testing, and in 2013, a Utah judge signed an order recognizing his paternity and requiring him to pay child support. At some point, Mother moved to Houston with Andy.

According to the record, Father lived for a while with Mother, Andy, and Andy's maternal grandmother ("Grandmother") when Andy was approximately three to five years old. Father left, and Andy remained under Mother's primary care until Andy was nine years old. At that time, in 2019, Father took possession of Andy in Utah at Mother's request. According to Father, Mother said she could not care for Andy and asked Father to take him. Andy remained in Father's care until February 2020 when Andy returned to live with Mother.

On April 13, 2020, the Department of Family and Protective Services (the "Department") filed suit to protect Andy and his three half-siblings based on allegations of Mother's neglectful supervision and physical abuse. The Department alleged that Mother, in September 2019, was living in Houston motels, engaging in prostitution, abusing methamphetamines, and leaving Andy's half-siblings unfed

2

and unbathed.[2] The Department further alleged that Mother moved "back and forth" between Houston and Utah from September 2019 to April 2020. After the court named the Department temporary managing conservator, Andy and all of his half-siblings lived with Grandmother beginning in April 2020.

It was during the Department's investigation of Mother's alleged neglectful supervision of her other children when Andy and Father came to the Department's attention in an April 2020 interview. Department caseworker Dejanay Blackwell testified about her contact with Andy. Blackwell said that Andy refused to participate in family therapy with Father. When Blackwell discussed how important it was for Andy to do so, Andy disclosed that Father whipped, beat, and choked him while he was in Father's care. Andy also disclosed to Blackwell that "there was a gun pointed to his head." Blackwell testified that Andy wanted nothing to do with Father because of this abuse. When Blackwell questioned Father, Father "stated that his preferred method of discipline was whipping and -- and yelling[.]" Blackwell testified that the Department believed that placing Andy with Father would place him in danger. Blackwell stated that, when Father is mentioned, Andy "shuts down," "balls his fists," and will not talk anymore. When Father attempted to video chat during a phone call with Andy, Andy passed the phone back to his caregiver. Blackwell believed that it would hurt Andy's emotional well-being to be forced to have contact with Father and that Andy was afraid to see Father.

At the time of the children's removal in April 2020, Father lived in Utah and claimed to be unaware of Andy's location. Although the Department sought termination of Mother's parental rights as to all the children, proceedings involving Andy were severed and tried separately after Father answered in April 2021 and

---

[2] September 2019 is during the period Father had possession of Andy in Utah.

sought to be named Andy's sole managing conservator or, alternatively, a possessory conservator.[3]

According to Blackwell, Father was provided a family service plan, which required him to verify his employment, housing, and "to complete a psychosocial" evaluation; she went over the service plan with Father and he demonstrated that he understood the plan. Nonetheless, Blackwell was unable to maintain "decent contact" with Father throughout the case, and Father did not contact her to schedule virtual visitation with Andy. Among other things, Father did not complete the psychosocial evaluation required by the plan, even though Blackwell made it clear that he could complete the evaluation on-line from his residence in Utah.

Blackwell confirmed that she visited Andy's placement with Grandmother and that his physical and emotional needs were met there. She testified that Grandmother provided excellent care to Andy and his half-siblings. Blackwell believed that Andy should remain in his current placement because Grandmother was protective and able to manage his physical and emotional needs. Andy was adamant that he wanted to stay with Grandmother and his half-siblings. He was bonded with them. Although Andy missed some school before coming into Grandmother's care, Grandmother helped him catch up. Additionally, Blackwell acknowledged that Grandmother was willing to facilitate an appropriate relationship between Andy and Father, so long as Andy was comfortable and willing. However, according to Blackwell, Grandmother made her aware that Father had not contacted Grandmother until recently.

---

[3] In other proceedings, Mother's parental rights to Andy's half-siblings were terminated, and the court found that Mother knowingly placed the children in conditions or surroundings that endangered them and that she engaged in conduct that endangered them. Grandmother was appointed permanent sole managing conservator of Andy's three half-siblings.

Father testified that Andy was almost eleven years old, and Father had known Andy's mother for about twelve years. Father confirmed that before Andy was in school, Father lived with Andy and Mother at Grandmother's home for a short time. From 2019 to 2020, Andy lived with Father in Utah for about eight to ten months, and Mother did not live with them during that period. Father took Andy in at Mother's request. According to Father, Andy identified Father as his "dad." However, Father acknowledged that Andy was a little "standoffish" and "rude" when Andy first moved in with him. It took Andy "a couple of days to warm up to" Father.

Father enrolled Andy in school in Utah. On a typical day, Andy walked to school, and Father provided Andy with a mobile phone to call him when Andy arrived at school. When he came home from school, Andy did chores and then would play basketball. Father and Andy went to the gym and read every day. They also played games. Father was involved in Andy's school and was there "a lot with him." Father said that he had a great bond with Andy, who is not Father's only child. Father is a single parent to a two-year-old daughter as well. While Andy lived with him, Father was still in a relationship with his daughter's mother. Andy loved his half-sister and "was always holding her and playing with her."

Father admitted his primary form of discipline was whipping and yelling, but he denied that he ever pulled a gun on or choked Andy. Father was surprised that Andy would claim that he had done so. However, he acknowledged that he was told Andy was afraid of him and that Andy might be afraid of him due to his discipline methods.

Andy returned to Mother in February 2020, and Father has not seen Andy since then. Father denied knowing that Mother engaged in prostitution or used drugs until "recently." According to Father, he did not provide support for Andy while

Andy was in Mother's care because he "didn't know where he was." He also acknowledged that he did not provide Grandmother with any support for Andy. Father understood that he could not visit with Andy because Andy did not want to see him. He acknowledged that, even though he was not visiting Andy, it would have been in Andy's best interest to provide some kind of support. He also claimed that Andy's first caseworker did not give him Grandmother's contact information and would not respond to his calls and texts.

According to Father, he was not informed that he had to complete a psychosocial assessment as part of his parenting plan. Father testified that he provided information about his employment and residence to the previous caseworker. Father acknowledged that part of his job as Andy's father was to "repair and rebuild" his relationship with Andy. He also testified that, since the Department became involved in this case, he had grown as a parent and came to understand that he needed to be patient and understanding with Andy. He stated that whipping Andy was "not the way to go about things." Father also stated that he would not force Andy to see him or stay with him if Andy did not want that. Father understood that Andy was not interested in leaving his half-siblings or Grandmother.

Grandmother testified that Andy has been in her care since April 2020. Grandmother explained that Andy told her he does not want to be around Father and was "adamant" that Father "put[] his hands on him." Andy told Grandmother that Father would beat him when he wet the bed or read something wrong and had choked him. Grandmother had no reason to believe that Andy was not being truthful about these incidents.

According to Grandmother, Andy was initially withdrawn when he came into her care, but now he is outgoing, plays basketball, plays with other children and his half-siblings, and helps around the house. Grandmother said that, long-term, she

6

wanted to see Andy go to college. She would like Andy to have a relationship with Father, but only when Andy is ready to do so. She testified that she would be open to post-termination access between Father and Andy whenever Andy wanted to see Father. However, Grandmother noted that Father never offered to provide support for Andy and never said he would come to Houston to visit Andy. Grandmother stated that it would not be fair to separate Andy from his half-siblings because she believed it would hurt his emotional well-being to do so. Grandmother explained that she planned to adopt Andy and his three half-siblings who were in her care.

At the conclusion of the trial, the court found clear and convincing evidence that: (1) Father engaged in conduct or knowingly placed Andy with persons who engaged in conduct that endangered his physical or emotional well-being; (2) Father constructively abandoned Andy, who had been in the Department's temporary managing conservatorship for not less than six months and (a) the Department made reasonable efforts to return Andy to Father, (b) Father had not regularly visited or maintained significant contact with Andy, and (c) Father had demonstrated an inability to provide Andy with a safe environment; and (3) Father did not comply with the provisions of a court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(E), (N), (O). The court further found that termination of Father's rights was in Andy's best interest and that Grandmother should be appointed Andy's sole managing conservator. *See id.* §§ 161.001(b)(2); 161.207(a). Based on these findings, the trial court signed a final order terminating Father's parental rights to Andy.

## Analysis

### A.      Standards of Review

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence

7

one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). *See* Tex. Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.— Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *See In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the challenged finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *See id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not

mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345 (internal quotation omitted). We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B.    Predicate Grounds

In his first three issues, Father argues the evidence is legally and factually insufficient to support termination under the predicate grounds on which the court relied, namely subsections 161.001(b)(1)(E), (N), and (O).

### 1. *Applicable law*

To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best interest finding—even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Further, due to the significant collateral consequences of

9

terminating parental rights under section 161.001(b)(1)(D) or (E),[4] which address endangering conduct or exposure of the child to endangering environments, "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d at 237. Thus, when, as here, a parent challenges predicate termination grounds under subsection 161.001(b)(1)(E), we must address them and detail our analysis. *See id.* We will address the trial court's finding of endangerment under subsection (E). If we conclude that Father's termination of parental rights is supported under that subsection, then we need not address whether termination is also supported under subsections (N) or (O). *See id.* at 232.

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best interest finding, that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection (E)

---

[4] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and convincing evidence supports a finding that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." Tex. Fam. Code § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.*

Father contends that "improper discipline" does not rise to the level of endangerment. Yet "[d]omestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.). "Inappropriate, abusive, or unlawful conduct by a parent . . . who lives in the child's home can create an environment that endangers the physical and emotional well-being of a child[.]" *In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied). Violence does not have to be directed toward the child or result in a final conviction. *Id.* "[I]f the evidence . . . shows a course of conduct which has the effect of endangering the physical or emotional well-being of the child, a finding under [section 161.001(b)(1)(E)] is supportable." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 534 (Tex. 1987). Without question, direct physical abuse of children endangers them. *In re L.W.*, No. 01-18-01025-CV, 2019 WL 1523124, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2019, pet. denied) (mem. op.) (citing *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *8 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.)).

### 2. *Application*

Andy told both Blackwell and Grandmother that Father had beaten and choked him.[5] Blackwell did not provide details regarding Andy's outcry to her, but

---

[5] Father objected that Andy's statements to Blackwell and Grandmother were hearsay. However, in a SAPCR proceeding,

> a statement made by a child 12 years of age or younger that describes the alleged abuse against the child, without regard to whether the statement is otherwise inadmissible as hearsay, is admissible as evidence if, in a hearing conducted outside the presence of the jury, the court finds that the time, content, and circumstances of the statement provide sufficient indications of the statement's reliability and:

Grandmother testified that Andy told her that Father beat him when he wet the bed or made errors while reading. From Grandmother's testimony, a fact finder reasonably could have formed a firm belief or conviction that Father "beat" Andy on more than one occasion. Additionally, Andy told Blackwell that Father pointed a gun to his head and choked him. Our record does not contain overwhelmingly detailed accounts of Father's abuse, but there is nonetheless sufficient evidence to produce in the mind of the trier of fact a firm belief or conviction that Father, on more than one occasion, engaged in a voluntary, deliberate, and conscious course of conduct that exposed Andy to loss or injury or jeopardized the child's emotional or physical health. *See* Tex. Fam. Code § 101.007; *In re M.C.*, 917 S.W.2d at 269.

Further, Blackwell and Grandmother both testified that Andy was afraid of Father and wanted nothing to do with him. Blackwell noted that, whenever Father was mentioned to Andy, Andy would "shut down," ball his fists, and refuse to talk. And Grandmother described an instance when Andy refused to participate in a video chat with Father. Father acknowledged that he whipped and yelled at Andy to discipline him and that Andy might be afraid of him because of his disciplinary methods. Although Father denied beating, choking, or pointing a gun at Andy, the trial court, as fact finder, could have discredited his testimony. Even though Father claims that his view of physical discipline has changed during the pendency of these proceedings, "[e]vidence that a person has engaged in abusive conduct in the past permits an inference that the person will continue violent behavior in the future."

---

(1) the child testifies or is available to testify at the proceeding in court or in any other manner provided for by law; or

(2) the court determines that the use of the statement in lieu of the child's testimony is necessary to protect the welfare of the child.

Tex. Fam. Code § 104.006. Although our record does not reflect that the requisite findings were made here, Father does not assert in his brief that this evidence should have been excluded.

12

*Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Father's inappropriate and abusive conduct was directed at Andy and created an environment that endangered Andy's physical and emotional well-being. *In re P.N.T.*, 580 S.W.3d at 355; *see also In re L.W.*, 2019 WL 1523124, at *11-12; *In re P.M.B.*, 2017 WL 6459554, at *8-9. Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights was justified under Family Code subsection 161.001(b)(1)(E). Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under this subsection. Accordingly, we conclude that the evidence is legally and factually sufficient to support the subsection (E) finding.

Having concluded that the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsections (N) and (O). *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Father's first three issues.

## C.    Child's Best Interest

In Father's fourth issue, he challenges the legal and factual sufficiency of the evidence to support the trial court's best interest finding.

### 1.  *Applicable law*

The best interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The fact finder may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the

child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *see also* Tex. Fam. Code § 263.307(b) (listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

2. *Application*

First, Andy was adamant that he wanted to stay with Grandmother and his half-siblings and did not want to be around Father. *See In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (child afraid of parent and "adamant that he d[id] not want to return to live with [his mother] and want[ed] to remain with his current family"). And Andy has bonded with his half-siblings and has a good relationship with Grandmother. *See In re T.C.C.H.*, No. 07-11-00179-CV, 2011 WL 6757409, at *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.) (children's bond with foster family implies that children's desires would be

14

fulfilled by adoption by the foster family). Andy's caseworker testified that Grandmother was meeting Andy's physical and emotional needs and was providing a safe environment for him. Grandmother testified regarding her plans for Andy's future, including her plan to adopt him and his half-siblings and her hope that he would attend college in the future.

In contrast, there was no evidence that Father visited Andy during the pendency of this case. In fact, there was evidence that Andy "shut down" when Father was mentioned and refused to participate in family therapy with Father, as well as evidence that Andy refused to participate in a video chat with Father. Thus, *Holley* factors 1, 2, and 7 weigh in favor of the trial court's best interest finding.

The evidence also showed that Father physically abused Andy, which tends to support a finding that termination is in the child's best interest. *See In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.—Amarillo Feb. 15, 2018, pet. denied) (mem. op.) (children's exposure to violence in the home undermines the safety of the home environment and is relevant when considering best interest). In addition to showing that Andy may be subject to future physical and emotional danger if Father had custody of him (*Holley* factor 3) and that Father's acts may indicate that his relationship with Andy is not appropriate (*Holley* factor 8), abusive conduct is also relevant to *Holley* factor 4—the parental abilities of the person seeking custody. *See In re C.A.*, No. 05-18-00645-CV, 2018 WL 5905634, at *14-15 (Tex. App.—Dallas Nov. 12, 2018, no pet.) (mem. op.). Father's abuse of Andy certainly indicates a lack of ability to care for Andy's needs. Thus, *Holley* factors 3, 4, and 8 also weigh in favor of the trial court's finding.

Additionally, Father did not complete his family services plan. He also did not provide testimony or evidence on a specific plan for Andy's future or how he would repair his relationship with Andy. In contrast, Grandmother testified that she

intended to adopt Andy and his half-siblings—she had already been appointed sole managing conservator of Andy's three half-siblings. Andy's caseworker testified that Grandmother was providing good care for Andy and his half-siblings, and she was helping Andy improve in school. This evidence is relevant to *Holley* factor 6 and weighs in favor of the trial court's best interest finding. Finally, Father provided no excuse for his acts and omissions with Andy, so *Holley* factor 9 likewise weighs in favor of the trial court's finding.

Father expressed that he had a good relationship with Andy. However, Father acknowledges in his brief that "[h]e misses his son but is not ready as of the time of trial to assume custody." Further, Andy's caseworker testified that Father had not provided proof of income and residence. And Father did not meaningfully visit Andy, nor did he provide any support for Andy during the pendency of the suit.

Viewing the evidence in the light most favorable to the judgment for our legal sufficiency analysis and all the evidence equally for our factual sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Father's parental rights was in Andy's best interest. *See* Tex. Fam. Code § 161.001(b)(2).

We overrule Father's fourth issue.

## D. Conservatorship

In his fifth and final issue, Father contends the trial court abused its discretion by appointing Grandmother Andy's sole managing conservator.

### 1. *Applicable law and standard of review*

Texas Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall

16

appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code § 161.207(a). Appointment of a nonparent may be considered a "consequence of the termination." *In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.— Houston [14th Dist.] 2016, pet. denied).

We review a trial court's appointment of a nonparent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). Rather than applying the clear-and-convincing-evidence standard to reviewing the appointment of a nonparent as a conservator, this determination is reviewed under a preponderance-of-the-evidence standard. *See id.*; *see also L.G.R.*, 498 S.W.3d at 207.

2. *Application*

Father suggests that he should have been appointed "at least a possessory conservator." He reasons that, when Andy is a teenager, he may want to develop a relationship with Father or might find that living with Grandmother's "rules of the house" could cause Andy to change his mind "about having at least a speaking and texting relationship with his father, if only to vent." He posits that having Father as a conservator would be in Andy's best interest because it would allow Grandmother to collect child support.

Father makes no argument that Grandmother is not "a suitable, competent adult." Tex. Fam. Code § 161.207(a). Nor do his arguments undermine the trial court's finding that appointing Grandmother as Andy's sole managing conservator was in Andy's best interest.

Having concluded that the evidence is sufficient to support the termination of Father's parental rights, we conclude that the trial court had sufficient information on which to exercise its discretion in appointing Grandmother as Andy's sole managing conservator. *See In re L.G.R.*, 498 S.W.3d at 207 (concluding trial court did not abuse its discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights).

We overrule Father's fifth and final issue.

## Conclusion

We affirm the trial court's judgment.

/s/    Kevin Jewell
Justice

Panel consists of Justices Jewell, Zimmerer, and Hassan.